**Bernard DODD, Petitioner,**

v.

**TEXAS FARM PRODUCTS COMPANY, Respondent.**

**No. B–7839.**

Supreme Court of Texas.

Jan. 31, 1979.

Larry R. Daves, Tyler, for petitioner.

William Drew Perkins, Luflin, for respondent.

SAM D. JOHNSON, Justice.

The issue to be resolved in this case is whether or not the trial court erred in granting the defendant's motion for judgment notwithstanding the jury verdict. Suit was instituted by Bernard Dodd, plaintiff in the trial court, against Texas Farm Products Company ("Texas Farm"), defendant below, for personal injuries sustained while working on the premises of Texas Farm. The case was tried to a jury, which

found in favor of Dodd, awarding him damages in the amount of $86,000. The trial court, however, granted Texas Farm's motion for judgment *non obstante veredicto* and rendered a take-nothing judgment against Dodd. The court of civil appeals affirmed the judgment of the trial court, holding that there was no evidence to support the jury finding of Texas Farm's negligence. 567 S.W.2d 919. Because we find that there was some evidence to support the jury findings, we reverse the judgments of the court of civil appeals and the trial court and render judgment on the jury verdict for Dodd.

At the time of the accident, Dodd was an employee of Lone Star Phosphate Company ("Lone Star") in Nacogdoches, Texas. Lone Star and Texas Farm are closely related, having common officers and stockholders. The two companies are located on lots adjacent to each other and are physically connected by a common shed approximately two hundred yards long. Lone Star produces phosphate which Texas Farm buys and uses to make fertilizer. Texas Farm is Lone Star's only customer. After the phosphate is produced at Lone Star, it is transported under the common shed over to the Texas Farm fertilizer plant where it is stored in bins.

On Friday, April 13, 1973, the day of the accident, Dodd reported to Lone Star for his regular work shift, which ran from six o'clock in the morning to two o'clock in the afternoon.[1] About nine o'clock, McShan, Dodd's foreman at Lone Star, asked him if he would go next door to the Texas Farm premises to move some sulfate that was in one of the storage bins. Dodd said that he would do so. Dodd then went over to Texas Farm with McShan.

Sulfate is a salt-like material that becomes tightly compacted when left in storage. In order to move the sulfate, a low grade, slow-burning dynamite was detonated to loosen and break it up. The explosive was referred to as powerful and dangerous. The testimony concerning the dynamite was that "they keeps it out in storage where fire and stuff ain't supposed to get to it. It's dangerous; that's dangerous stuff there." Dodd could obtain the dynamite from storage only when he was told by one of his bosses to do so. In order to detonate the dynamite, an auger-like rod first was used to drill a hole in the sulfate. Ten to twelve sticks of dynamite would then be put in the hole, with a blasting cap on one of the sticks. Wires would then be attached to the blasting cap and the battery on a tractor, which would be used to detonate the explosive. The explosive was not only powerful, but also sometimes erratic. As Dodd noted, "It'll blow—if it don't catch in there just right, it can blow that stuff from here to the back side of this court house." After the dynamite had been exploded, the loosened sulfate was then loaded by tractor with a front-end loader. On the instance in question, Dodd and his Lone Star foreman, McShan, placed a string of explosives in the hole they had drilled in the compacted sulfate. The dynamite was then detonated. For some unknown reason, the dynamite did not explode as planned. To quote Dodd, "Well, undoubtably, it broke up some, but it didn't fall like it was supposed to fall. It—a few buckets fell and I picked it up."

It is important to note here that the sulfate material was held in place by an

---

1. Dodd's primary job for Lone Star was operating machinery in the control room while making phosphate. However, it was not unusual for Dodd to work for Texas Farm, inasmuch as it was common for the two corporations to exchange employees. In fact, Dodd had worked the "graveyard" shift at Texas Farm the night before, from ten o'clock Thursday night until six o'clock Friday morning, at which time he reported to Lone Star for his regular shift. Dodd had been a regular employee of Texas Farm for about fifteen years, from 1953 to 1968, before being transferred to Lone Star in 1968. At the time of the accident, Lone Star employed twelve people and Texas Farm employed over five hundred. There was a frequent interchange of employees, with the "borrowing" company reimbursing the other for the borrowed employee's wages. This practice was considered by this court in a worker's compensation action brought by Dodd based on the same accident. *Dodd v. Twin City Fire Ins. Co.*, 545 S.W.2d 766 (Tex.1977).

elevated retaining wall of some sort. The wall, apparently made of plywood, was located about fifteen or twenty feet above the ground. Dodd testified that while he was picking up the sulfate, he heard a "pop." Looking up, he noticed that one of the angle iron support rods on the retaining wall was bent, twisted "a good half a round." He directed McShan's attention to this condition of the support for the retaining wall and tried to convince McShan to leave the site and return to the Lone Star plant. In his deposition testimony concerning the safety of the retaining wall after the explosion, McShan stated that he looked at it, inspected it, and concluded: "There was nothing wrong with the wall. At one time, I thought I saw it move, but I went on, and I said, well, it must not have moved; and I kept going." When asked if Dodd said "anything at all about the sulfate falling in," McShan replied, "I couldn't recall right now, to tell the truth." Dodd testified, however, that McShan had agreed to leave the scene after the explosion and their conversation.

At this time, however, Riddle, a supervisor for respondent Texas Farm, and the only Texas Farm employee connected with the accident, came to the site of the aborted explosion. It was under these circumstances and at this point in time that these two supervisors, Riddle of Texas Farm and McShan of Lone Star, had a private conversation out of the hearing of the employee, Dodd. During their conversation, Riddle glanced at the retaining wall, but made no further inspection of it. Following this conversation, McShan returned to Dodd with a complete change of plans. According to Dodd, "[McShan] told me, he came back and told me that he wanted to got [sic] ahead and get the sulfate out, and he

would knock it down, and would I pick it up."[2] Dodd responded, "If it don't kill you, I don't guess it'll kill me." While Dodd was doing the work as he was told, and as a result of the damage occasioned by the defective blast, the plywood retaining wall and the compacted sulfate crashed in upon him, resulting in extensive personal injuries.

Dodd filed the instant suit and at the trial testified to most of the aforementioned facts. Portions of McShan's deposition were read into the record, but McShan did not personally appear to testify. Riddle, the Texas Farm employee, did not testify either. The jury found that Texas Farm failed to inspect the retaining wall after the blast, that such failure was negligence, and that such negligence was a proximate cause of the accident.[3] The jury assessed Dodd's damages in the amount of $86,000. Upon motion by Texas Farm, the trial court rendered judgment notwithstanding the verdict. The court of civil appeals affirmed. We reverse the decisions of both courts.

■ To sustain the action of the trial court in granting the motion for judgment notwithstanding the verdict, it must be determined that there is no evidence upon which the jury could have made the findings relative to Texas Farm's failure to inspect the wall. In acting on the motion, all evidence must be considered in a light most favorable to support the jury verdict, and "every reasonable intendment deducible from the evidence" is to be indulged in favor of the verdict. *Douglass v. Panama, Inc.,* 504 S.W.2d 776, 777 (Tex.1974); *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547 (1962). Only the evidence and inferences therefrom that support the jury finding should be considered, with all contrary evi-

---

**2.** Although in another instance Dodd testified that McShan "asked" him to move the sulfate, he gave the following explanation of the meaning of that term: "Q Okay. Did you have any choice in terms of whether you could say no, I'm not going to do it, or anything else? A Well, not off-hand. If I did, I figured I'd be fired."

**3.** The jury failed to find that Riddle, the only Texas Farm employee at the scene of the accident, had actual knowledge of the condition of the retaining wall. The jury further failed to find that Dodd was contributorily negligent. The parties acknowledge that the manner in which this case was submitted to the jury would today be incorrect in light of our decision in *Parker v. Highland Park, Inc.,* 565 S.W.2d 512 (Tex.1978).

dence and inferences being rejected. *Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194 (1952). A judgment notwithstanding the verdict can only be upheld when rendition of a directed verdict would have been proper. Rule 301, Texas Rules of Civil Procedure.[4]

■ The court of civil appeals noted that if the retaining wall was in a dangerous condition, Texas Farm owed Dodd a duty to repair it and make it safe, and that this duty arose when Texas Farm learned of the dangerous condition or, in the exercise of reasonable care, *should have known of it.* This is not to be confused with *actual knowledge* of the condition of the retaining wall, and the jury in fact found here that Riddle did not have such actual knowledge. The issue is whether the record contains any evidence showing that there was a failure to properly inspect the retaining wall by Riddle. We are of the opinion that, when taken together, the events, the time involved, the instruments involved, and the surrounding circumstances present some evidence of a failure to properly inspect.

The evidence shows that Dodd and McShan were engaged in dangerous work with explosives on the premises of Texas Farm. As this was work that happened with regularity, it must have been known to Texas Farm. As it sometimes occurred, the explosion did not go as planned. It did result in a twisting of one of the angle iron support rods, which supported the retaining wall. This condition was visible at the site where *all* of the events took place. The condition was seen by Dodd. McShan even thought he saw the wall move and agreed to leave the site in any event. At this time, at the culmination of this sequence of events, Riddle, Texas Farm's supervisory employee, came to the site and proceeded to talk privately with McShan. During the conversation, Riddle at least glanced at the retaining wall. Being with McShan and Dodd, he could observe the same things they could see: the compacted sulfate that had not been properly loosened, the few buckets of sulfate on the ground that had been obtained from the abortive explosion, the two workers (McShan and Dodd) still on the premises, the tractor in place, nothing further being done to obtain the needed sulfate, and the two workers preparing to leave the premises. All of this occurred just after the abortive explosion on the premises during regular working hours and at a site under the supervision and control of the supervisory employee of Texas Farm. At the very least, this should have led to an inquiry into the circumstances of the defective explosion, which in turn could only have led to a discovery of Dodd's fears about the retaining wall. Riddle apparently made no such inquiry. Instead, immediately following Riddle and McShan's conversation, McShan proceeded directly to complete the dangerous work, instructing Dodd to finish moving the sulfate out of the bin where all of this had occurred. Dodd was injured while doing so. Under these circumstances, we are unwilling to say that there was no evidence from which the jury could have concluded that Riddle should have inspected the wall before either instructing the work to proceed or permitting the work to proceed.

"It was the jury's province to weigh all of the evidence and to decide what credence should be given to the whole or to any part of the testimony of each witness. 'The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable.' *Stephenville, N. & S. T. R. Co. v. Shelton,* Tex.Com. App., 208 S.W. 915, 916." *Lockley v. Page,* 142 Tex. 594, 180 S.W.2d 616, 618 (1944).

Since there was some evidence to support the jury findings, the trial court erred in granting Texas Farm's motion for judg-

4. In this connection, we note that the trial court overruled Texas Farm's motion for a directed verdict, stating as its reason therefor the following:

"[I'm concerned about] primarily whether or not there's any evidence to support this case going to the Jury. It appears there is some and we all recognize as attorneys that if there is any evidence of appropriate [*sic*] value it must be submitted to the Jury. The Court is of the opinion that there probably is some."

ment *non obstante veredicto* and the court of civil appeals erred in affirming such action. Therefore, we reverse the judgments of both courts. Inasmuch as Texas Farm brought forth no cross points in the court of civil appeals, we render judgment for Dodd on the jury verdict. *Jackson v. Ewton,* 411 S.W.2d 715 (Tex.1967).